NOT DESIGNATED FOR PUBLICATION

No. 112,668

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of J.W. (D.O.B. XX/XX/2003),
J.W. (D.O.B. XX/XX/2005),
K.W. (D.O.B. XX/XX/1997),
D.W. (D.O.B. XX/XX/2006), and
L.W. (D.O.B. XX/XX/2008).

MEMORANDUM OPINION

Appeal from Johnson District Court; KATHLEEN SLOAN, judge. Opinion filed December 11, 2015. Reversed and remanded with directions.

*Dennis J. Stanchik*, of Olathe, for appellant natural mother.

*Shawn E. Minihan*, assistant district attorney, and *Stephen M. Howe*, district attorney, for appellee.

Before GREEN, P.J., HILL, J., and TIMOTHY G. LAHEY, District Judge, assigned.

*Per Curiam*:  The district court terminated the parental rights of R.E. (Mother) and J.W. (Father), and Mother appeals. Mother contends the court erred in finding clear and convincing evidence she was unfit pursuant to K.S.A. 2014 Supp. 38-2269(b)(4), (b)(7) and (b)(8) and erred by concluding that it was in the children's best interests to terminate her parental rights to her five children. We agree and reverse the termination of parental rights, affirm the child in need of care (CINC) finding, and remand the case for a dispositional hearing.

1

The CINC petition in this case was filed because of an allegation by Mother's daughter, K.W. (DOB: 1997), that she had been sexually abused by Mother's live-in boyfriend. Mother did not believe the allegation. Although the district court did not find KW had been sexually abused, it determined that K.W. had been emotionally neglected because Mother did not believe and support her daughter's allegation of abuse. The four younger children J.W. (DOB: 2003), J.W. (DOB: 2005), D.W. (DOB: 2006), and L.W. (DOB: 2008), were adjudicated as children in need of care solely due to the above stated emotional neglect of K.W. Mother's parental rights to all five children were terminated on the basis of the evidence presented at the hearing.

The district court's decision was in part based upon Mother's prior CINC involvement with another daughter, C.M., who was in fact sexually abused by K.W.'s father, J.W. In that case, Mother did not believe C.M.'s allegations even after J.W. had been convicted and sent to prison for the abuse. A second CINC was filed in 2009 after J.W. was sent to prison. The children were adjudicated and were in the State's custody for approximately 2 months and the case ultimately dismissed.

We begin with a review of the prior CINC cases followed by our analysis of the current case.

*CINC family history*

*2006 CINC proceeding*

In its ruling, the district court noted that Mother and Father were well known to it. In 2006, the State filed a petition alleging that C.M. (age 15), who was the daughter of Mother, was a CINC due to sexual abuse at the hands of her stepfather, J.W., who is the father of the five children in this action. Mother stipulated to the CINC finding and

stipulated that she did not believe C.M.'s allegations of sexual abuse against J.W. She believed that he was innocent. In November 2006, C.M. was adjudicated to be a child in need of care. In December, Mother and C.M.'s natural father were offered separate reintegration plans. In March 2007, the district court found that minimal progress had been made and that Mother had not become involved in individual counseling or family therapy as required by the reintegration plan. In August 2007, the court was advised that reintegration with the natural father was being pursued and that Mother was not challenging that placement. The CINC case was closed in 2008 when C.M. was reintegrated with her natural father. We note that Mother's five children with J.W. were not part of the CINC proceeding and were not removed from Mother's care during the 2006 CINC proceeding involving C.M.

*2009 CINC Proceeding*

J.W. was convicted of sexual abuse of C.M. and sentenced to prison sometime in 2008. In December 2008, the Kansas Department of Children and Families (DCF) received a report expressing concern about Mother's postpartum depression and the conditions of the home. There was concern that L.W., who was born in 2008 and has Down syndrome, was not getting enough nutrition. Father had been sentenced to prison, so Mother was the sole parent in the home for her five children. When social worker Erin Dewitt spoke with Mother about the concerns, Mother told her that she felt overwhelmed financially, was depressed, had sleeping issues, and suffered from Sjogren's syndrome, which is similar to lupus. Based upon Dewitt's concerns of Mother's ability to parent her five children, a CINC petition was filed. The children were adjudicated children in need of care on April 15, 2009, and the children were placed in the temporary custody of the State. Mother was offered a 6-month reintegration plan. Reintegration was successful and the children were returned to Mother's custody by the end of May 2009. The children were in the State's custody for less than 2 months. The CINC proceeding was dismissed in October 2009.

3

*Current CINC case*

*January 18, 2013, report*

On January 18, 2013, DCF received a report of concern for Mother's children indicating concern over neglect, the condition of the home, and about Mother's boyfriend, S.P., living in the home.

DCF social worker Bonnie Brightwell was assigned to investigate a report regarding physical neglect. The report alleged Mother's house was "kind of in shambles," that there was a new boyfriend in the home, that the kids were spending excessive amounts of time in their room, and they were not being fed dinner. In her investigation, Brightwell observed the home and found it was suitable though sparsely furnished. There were no hazardous or health concerns. Mother reported that since S.P. moved in things were getting tidied up and back in a more functioning order for the family. The children were interviewed and reported they were not required to stay in their rooms for extended period of time and said they were being properly fed.

*January 29, 2013, report*

Before Brightwell concluded her review of the January 13 report, DCF received a second report involving the family. That report alleged that K.W. had been sexually abused by S.P.

K.W. was interviewed the next day by DCF social worker Erin Dewitt as part of an initial safety assessment. During the assessment, K.W denied that S.P had sexually abused her. She did, however, express that S.P. made her feel uncomfortable. S.P would tell K.W. to do things to look prettier and that he had talked about her "butt" in the past. She stated that if she was wearing a shirt that was too revealing, he would "put it up so that she [was not] revealing anything." She also said she did not have a doorknob on her

4

bedroom and on one occasion S.P. had come in her room unannounced and told her to cover up because her shorts were too revealing.

She reported to Dewitt that she felt her Mother was focusing on her relationship with S.P. rather than her. She was also angry that S.P. had given her a different room after he moved into the home.

Following the January 29, 2013, report, Brightwell ran a background check on S.P. and discovered he was on parole for a 2000 criminal conviction for second-degree murder and manslaughter in Shawnee County. Brightwell discussed this discovery with Mother who stated that she was aware of his criminal background. Mother thought S.P. was great with the kids. Mother dated S.P. for less than 2 months before he moved into the home in approximately November 2012. At some point in her conversation with Brightwell, Mother agreed that, in light of K.W.'s allegations, it was in the children's best interest for S.P. not to provide unsupervised care for the children. This "safety plan" was to last approximately 6 months.

No further action was taken and DCF determined the allegation of sexual abuse was unsubstantiated.

*July 2013 report*

In July 2013, another report concerning Mother's family was assigned to Brightwell. K.W. alleged that she lied when she was previously interviewed by the police and DCF and that she actually had been sexually abused by S.P. In her July 29, 2013, interview with Brightwell and Overland Park Police Detective Casey Shearer, K.W. said that she did not disclose the sexual abuse previously because she was worried about what would happen to Mother and the other children. Shearer testified that K.W. acknowledged that her older sister had been put in foster care when she was younger and

that K.W. did not have the best relationship with Mother since that time. K.W. also knew that Mother did not believe her claims of sexual abuse by S.P.

Brightwell testified that K.W.'s allegations involved digital penetration and oral contact, and K.W. said that she told Mother about the abuse. On August 7, 2013, Brightwell and Shearer visited Mother to discuss the allegations. Mother initially denied that K.W. had told her about any abuse but later admitted that she had done so during an argument. Mother did not believe the accusation and said she and S.P. offered to call the police, but K.W. did not want them to do so. Over the course of the interview, Mother also told Brightwell and Shearer that K.W. was "exceedingly promiscuous," was "gross and disgusting," and was a "liar," and that Mother did not believe any of it. Mother told Shearer that she believed K.W. was unhappy with her home situation, did not want to be there, and wanted to do what she wanted to do. She believed that K.W. was making up the allegations to use as leverage because of the past abuse by J.W.

While Brightwell was speaking to Mother, she observed S.P. providing unsupervised care to the children in the home contrary to the previously established safety plan. Mother explained that her relationship with S.P. had progressed and that was why he was having full contact with the children.

Because of the renewed sexual abuse allegation by K.W., Brightwell requested that CINC proceedings be initiated. There were no allegations of abuse of the other children, but due to the police investigation and Brightwell's concern about Mother allowing S.P. to be alone with the children, Brightwell sought removal of all of the children from Mother's residence.

K.W. was not living at home when the CINC petition was filed. In June 2013, due to the conflict at home, Mother arranged for K.W. to live with a friend's family, the Fitzers. Mother and the Fitzers had an informal guardianship in which K.W. would live

6

with the Fitzers who would see to K.W.'s needs, including getting her involved in counseling.

*CINC initiated*

On August 29, 2013, the CINC petition was filed and the district court scheduled a first appearance following the temporary custody determination. The court placed the children in the temporary custody of DCF.

KVC Behavioral Healthcare (KVC) was the agency placed in charge of the children's care. Heather Leader was a permanency case manager with KVC and worked with Mother and the children from August 29, 2013, the date they came into State's custody, until February 28, 2014. There was an interim case manager for 2 months and then an adoption case manager, Karra Friedli, worked the case from May 1, 2014, to the trial date.

The first time Leader met with Mother on September 3, 2013, Mother told her that she and S.P. were going to get married. S.P. had been living with Mother and the children for about 10 months at that point. Mother had her first visit with the children on September 13, 2013. Everything was appropriate at that visit. On September 20, 2013, Leader met with Mother and S.P. for the first formal case plan. At that meeting, both Mother and S.P. were given case plan tasks. In the first few weeks after the children came into care, Leader talked with Mother about S.P. moving out of the home, but Mother consistently indicated that was not an option at that time.

K.S.A. 2014 Supp. 38-2263(b) provides: "Whenever a child is subject to the jurisdiction of the court pursuant to the code, an initial permanency plan shall be developed for the child and submitted to the court within 30 days of the initial order of the court." Consistent with this requirement, a case planning conference was held on

7

September 20, 2013, and Mother was presented with a "Permanency Plan for Child in Custody" for each child prepared by KVC.

The plan reflected the agency was involved because "DCF received a report of sexual abuse in the home and the mother's failure to believe and protect." The plan recognized "[t]he children have a close bond with one another and their mother. The four younger children have a positive relationship with [S.P.]." The permanency goal was reintegration in the Mother's home. Mother and S.P. were each given permanency objectives as part of the KVC plan.

Mother's case plan tasks were:

(1) Meet with KVC manager once per month to discuss case plan goals;

(2) Sign all necessary releases and complete paperwork in a timely manner;

(3) Maintain consistent and appropriate visits with the children;

(4) Complete a level 3 psychological evaluation and follow all necessary recommendations;

(5) Provide monthly budget;

(6) Provide proof of employment, transportation, and housing;

(7) Participate in family therapy when deemed appropriate.

The initial appearance was scheduled for October 20, 2013, but was continued for reasons unrelated to Mother. Mother filed an answer contesting the State's petition and on December 19, 2013, the State amended its petition to include its request for termination of Mother's parental rights. No further court proceedings were conducted until the trial in June 2014.

The evidence at trial revealed Mother consistently visited all of the children throughout the pendency of this case. She was allowed 1 hour per week of supervised

visitation. All of the children were present for the visitation. Leader observed most of the visitations and testified that she witnessed no behavior which caused her to question mother's ability to parent. Mother met with KVC regularly, maintained employment, had suitable housing and transportation, and provided a monthly budget to KVC, all as required by the permanency plan. The psychological examination was scheduled by KVC and did not occur until February 19, 2013, almost 6 months after the case was filed. The delay in scheduling and completing the evaluation was not caused or contributed to in any way by Mother.

On February 3, 2014, Leader met with Mother and S.P. to discuss their case plan progress. Mother was upset and talked about being overwhelmed and feeling like giving up because of how much KVC was asking of her. Leader told Mother that S.P. being in the house was still a big issue. S.P. then said he would move out if he knew the children would be returned to the home. Mother responded by becoming defensive and saying that no one could tell her who she could or could not see. According to Leader, Mother consistently stated that S.P. was part of the family and she did not plan on leaving him. At that point, Mother had completed all of her case plan tasks other than the therapy requirement from the yet to be completed psychological evaluation.

During February 2014, Leader told Mother that if S.P. did not move out, she would not be able to recommend reintegration of the children until everybody went through counseling. Leader took on other responsibilities and stopped working on the case on February 28, 2014. At that time, she did not believe reintegration was a viable option because S.P. was still residing in the home and no therapy services had been started. Leader stated that whether or not K.W.'s allegation of sexual abuse was true, Mother failed to provide any emotional support or act as a safety net after she became aware of the allegation. Leader did not provide any factual detail or examples of Mother's failures regarding emotional support or acting as a safety net.

9

Leader spent more time than any witness with the family and supervised most of the visits. Although she testified she did not believe reintegration was appropriate because S.P. lived in the home, when asked if Mother was fit or not fit to parent her children, Leader said she had no opinion.

*The psychological evaluation*

Mother's psychological evaluation was conducted on February 19, 2014, and the report prepared on March 13, 2014. Donald Jones is a master's level psychologist with KVC who performed evaluation.

In his evaluation, Jones found that Mother has a tendency towards depression and to be dependent on someone else to handle conflicts within the family. Jones stated that it concerned him that Mother's relationship with S.P. was very short before he moved in and took over the role of disciplinarian in the household. He felt that Mother should have been learning from a therapist how to enrich her own discipline techniques. Mother told Jones that she saw her relationship with K.W. as deteriorated and conflicted and she believed K.W. was alleging sexual abuse as a reaction to S.P. being too harsh with his discipline.

Jones testified that he was concerned that Mother did not look more closely at K.W.'s allegations against S.P. He stated that if Mother was dependent on S.P., it would be very concerning that she was not listening to her daughter. He stated that the fact that there is a history of sexual abuse in the family was a sign of a deeper problem in the family. As a result of his evaluation of Mother, Jones recommended that Mother seek individual and family therapy. He testified that completing individual therapy before family therapy was not essential, but it was recommended.

Jones testified that he also administered a psychological evaluation to K.W. He concluded she seemed to have two roles in her household. First, she was a teenager with normal and, at times, even exaggerated conflicts. Second, she was a caretaker for her younger siblings. In his testimony, Jones did not provide any detail about the issues for which K.W. was receiving therapy, and he did not identify any specific actions or failures on the part of Mother as being the root cause of whatever K.W.'s issues may have been.

The district court determined the children were in need of care, found clear and convincing evidence that Mother was unfit pursuant to K.S.A. 2014 Supp. 38-2269(a)(4), (b)(7) and (b)(8), and concluded that her unfitness was unlikely to change in the foreseeable future. Finally, the district court found it was in the children's best interests to terminate Mother's rights to her five children.

ANALYSIS

*Did the district court properly terminate Mother's parental rights to her children?*

Because a parent has a fundamental liberty interest in the relationship with his or her child, the allegations of conduct that form the basis for termination must be proved by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. 745, 769-70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). In order to terminate parental rights, a district court must find by clear and convincing evidence that a parent is unfit by reason of conduct or condition which renders the parent unable to properly care for his or her child, that the conduct or condition is unlikely to change in the foreseeable future, and that termination of parental rights is in the child's best interests. K.S.A. 2014 Supp. 38-2269(a), (g)(1). The State bears the burden of proof in this matter.

11

In reviewing a district court's decision terminating parental rights, this court must consider "whether, after review of all the evidence, viewed in the light most favorable to the State, it is convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that [the parent's rights should be terminated.]" *In re B.D.-Y*, 286 Kan. at 705. Appellate courts must not reweigh the evidence, pass on the credibility of witnesses, or redetermine questions or fact. 286 Kan. at 705.

Clear and convincing evidence is "an intermediate standard of proof between preponderance of the evidence and beyond a reasonable doubt." 286 Kan. at 691. It is evidence which shows that the truth of the facts asserted is highly probable. This refers to the quantity rather than the quality of the evidence. 286 Kan. at 697.

*Unfitness*

K.S.A. 2014 Supp. 38-2269(b) provides a nonexclusive list of factors a district court must consider when determining whether a parent is unfit. The existence of any one factor listed in K.S.A. 2014 Supp. 38-2269 standing alone may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2014 Supp. 38-2269(f). Here, the district court specifically relied on three statutory factors in determining Mother was unfit to properly care for her children: K.S.A. 2014 Supp. 38-2269(b)(4) (physical, mental, or emotional abuse or neglect or sexual abuse of a child); K.S.A. 2014 Supp. 38-22699(b)(7) (failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family); and K.S.A. 2014 Supp. 38-2269(b)(8) (lack of effort on the part of a parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of a child).

In addition to the foregoing factors, K.S.A. 2014 Supp. 38-2269(c) provides that when a child is not in the physical custody of the parent, as was the case with K.W. when the petition was filed, the court shall consider (1) failure to assure care of the child in the

12

parental home when able to do so; (2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child; (3) failure to carry out a reasonable plan approved by the district court directed toward the integration of the child into a parental home; and (4) failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay.

*K.S.A. 2014 Supp. 38-2269(b)(4)—physical, mental, or emotional abuse or neglect or sexual abuse of a child*

Mother first argues that the district court erred by finding that she was unfit under K.S.A. 2014 Supp. 38-2269(b)(4) which requires a district court to consider the "physical, mental or emotional abuse or neglect or sexual abuse of a child" when making a determination of unfitness.

Although the case began with allegations of sexual abuse, the district court found only that mother had emotionally neglected K.W. DCF investigated the allegation of sexual abuse twice, first in January 2013 and then in July 2013. It is not clear from the record when DCF concluded its investigation following the July interview with K.W., but DCF found the allegations were unsubstantiated. The Overland Park Police Department also investigated the allegations and did some forensic testing based on K.W.'s allegations. Mother and S.P. fully cooperated with the police department in the investigation. The investigation concluded and no criminal charges were filed. More importantly, the trial court, which was provided K.W.'s July interview concerning the alleged abuse, did not find sexual abuse occurred here. The district court's finding under K.S.A. 2014 Supp. 38-2269(a)(4) was for emotional neglect:

> "The Court finds and concludes that the evidence is clear and convincing that [K.W.] has been emotionally neglected by her mother. Whether true or not, the fact that [K.W.] made allegations of sexual abuse is a strong indication that her emotional and psychological needs were not being met at home. Not only did the social professionals

13

agree with this conclusion at trial, the mother also agreed. In her testimony, [Mother] admitted that she did not believe [K.W.]'s disclosures of sexual abuse by [S.P.] This Court does not have to find that [K.W.] was, in fact, sexually abused by [S.P.] It was emotionally neglectful for the mother to accuse her daughter of being a liar and to not support her daughter when she made these allegations. Although there is undisputed evidence that [Mother] made arrangements for [K.W.] to live with the family of a school friend, there is no evidence from which to conclude that [Mother] attempted to maintain regular contact with her daughter, provide financial support to the family with whom her daughter lived, or take any actions that might communicate emotional support to her daughter."

The statutory definitions contained in K.S.A. 2014 Supp. 38-2202 make a distinction between emotional abuse and emotional neglect. Abuse is the infliction of emotional harm or the causing of a deterioration of the child. It may include, but is not limited to, maltreatment or exploitation of a child to the extent the child's emotional well-being is endangered. K.S.A. 2014 Supp. 38-2202(y). "Neglect" is defined as "acts or omissions by a parent . . . resulting in harm to a child, or presenting a likelihood of harm." K.S.A. 2014 Supp. 38-2202(t). "Harm" is defined as "physical or psychological injury or damage." K.S.A. 2014 Supp. 38-2202(1).

Based on a plain reading of these definitions, a showing of emotional neglect requires either psychological injury to a child or actions or omissions by the parent which present a likelihood of psychological injury to the child.

The record must contain clear and convincing evidence of a psychological injury and the acts or omissions by Mother which caused or were likely to cause injury. Here, the district court found that K.W.'s emotional and psychological needs were not being met at home but it did not specify the harm suffered or likely to be suffered.

14

Friedli, the adoption case manager who worked on the case for the last 6 weeks before trial, testified that K.W. felt very sad and felt she lacked an emotional safety net because Mother did not believe her abuse allegation. Beyond K.W.'s feelings, the record does not disclose any harm she suffered or was likely to suffer. In order for the court to find psychological injury or the likelihood of such injury as it relates to a parent's fitness, there must be something more than sad feelings by an adolescent child. In this case, K.W. had a psychological evaluation by Jones and she was in counseling. The counselor did not testify, and Jones' testimony did not identify any psychological diagnosis or the reason K.W. was seeing a counselor. We observe, for example, she could have been in counseling to address problems related to peer issues at school or because her father went to prison. The point being that the record does not identify specific evidence of a psychological injury or likely injury related to Mother's treatment of her.

Even when psychological injury or likelihood of injury is shown, the evidence must connect it to some parental action or inaction that implicates the fitness of that parent. There must be acts or omissions *by the parent* that result in the psychological harm. K.S.A. 2014 Supp. 38-2202(t). There was no testimony by any witness which connected any psychological injury to K.W. to acts or omissions by Mother.

After finding that Mother did not believe her daughter's allegations of sexual abuse, the court found: "This Court does not have to find that [K.W.] was, in fact, sexually abused by [S.P.]. It was emotionally neglectful for the mother to accuse her daughter of being a liar and to not support her daughter when she made these allegations."

The only place in the record where Mother called K.W. a "liar" was in her interview with Brightwell and K.W. was not present at the time. The trial record does not include any evidence of a conversation or argument between Mother and K.W. in which Mother accused her daughter of being a "liar." The method by which Mother conveyed

15

her disbelief of K.W.'s allegations could have been delivered in an emotionally cruel way which might cause emotional harm to a child. Here, however, the record does not contain any such evidence. The record here is devoid of specific factual instances which relay the content of any interaction or detail describing a lack of interaction between K.W. and Mother regarding the abuse allegation.

The district court also found "[Mother] understood that her disbelief in [K.W.]'s disclosures of sexual abuse by her mother's live-in boyfriend would have a profoundly negative effect on her daughter." The reasoning behind this finding is not explained by the district court and we are unable to identify the evidence in the record which supports this finding.

Finally, the district court fails to identify how Mother failed to support her daughter. What did the mother fail to do that a fit parent would do? Did she ignore K.W., was she hateful towards her, did she force her to stay in her room, did she say mean things to her, did she tell her she was not loved, did she fail to tell K.W. she was loved, did she fail to interact with her? The record does not contain facts in evidence describing and connecting Mother's action or inaction concerning K.W.

Given the lack of evidentiary interconnection between Mother's actions or inactions and K.W.'s psychological condition, we are not convinced a rational factfinder could find clear and convincing evidence that Mother was unfit based upon K.S.A. 2014 Supp. 38-2269(a)(4).

The district court also found the four younger children had been emotionally neglected by Mother. The only allegations involving the younger children were from January 2013. DCF investigated that allegation and found it to be unsubstantiated. Again, we have searched the record and find no evidentiary support for the district court's conclusion.

16

*K.S.A. 2014 Supp. 38-2269(b)(7)—failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family*

A parent may be found unfit when there is clear and convincing evidence that the reasonable efforts of appropriate public or private agencies to rehabilitate the family have failed. Here, KVC was the agency tasked with rehabilitating the family. There was no district court supervision or oversight of the permanency plan which KVC established in this case because there was no adjudication or dispositional hearing prior to this trial.

In its ruling, the district court found: "There were numerous efforts to rehabilitate the family, and those efforts were reasonable albeit unsuccessful." Mother argues that KVC failed to undertake reasonable efforts to assist her in accomplishing the tasks set forth in the permanency plan and therefore the court erred in its finding. The stumbling block to reintegration, according to KVC, was the presence of S.P. in the family home. We note that the permanency plan did not include S.P.'s removal from the home as a task for Mother, or as a requirement to accomplish the stated case goal of reintegration.

The purposes of permanency planning are to assure permanency, stability, and safety in a child's living situation and to preserve family relationships and connections. K.S.A. 2014 Supp. 38-2263(a). KVC's permanency plan goal was for reintegration and the plan set forth tasks for Mother to accomplish to meet the goal. The evidence shows Mother accomplished all of the tasks that were assigned to her with the exception of following the recommendations of her psychological examination.

KVC assumed responsibility for scheduling the psychological examination with a KVC employee and the testimony shows Mother was not given an option of obtaining an evaluation elsewhere. The requirement became part of the plan on September 20, 2013, yet the record shows no action by KVC to schedule the evaluation by December 19, 2013, when the State amended its petition to include termination of Mother's rights.

17

Through no fault of Mother's, who was otherwise accomplishing all of her assigned tasks, the psychological examination was not scheduled until February 19, 2014. KVC's efforts in this regard were not reasonable. The report of the examination was not prepared until March 13, 2014, which was more than 2 weeks after the assigned case manager, Leader, stopped working on the case.

Given that Mother otherwise completed the assigned tasks in the permanency plan, what services did KVC provide or offer that were directed to assist Mother in meeting her final uncompleted task? The record fails to show clear and convincing evidence of any actions reasonably calculated to assist Mother in complying with the recommendations of her psychological examination and thereby help preserve this family.

Mother met all of the requirements of the KVC case plan except for following the recommendations of her psychological examination. Mother testified that she never saw the evaluation and that no one discussed the recommendations of the report with her. The original case manager, Leader, testified she received the report and discussed it with Mother. However, Leader stopped working on the case on February 28, 2013, and the evaluation was not prepared until after her departure as case manager. Jones testified he prepared the report on March 13, 2014, and this is confirmed by the report itself which was admitted into evidence. Christina Reynolds was the interim case manager and did not testify in the case. Adoption case manager Freidli did not discuss the evaluation with Mother since she was not aware of it until a week before trial.

Friedli testified she becomes involved in a case when the goal changes from reintegration to termination. She took over as case manager on May 1, 2014. KVC determined there would be no reintegration as long as S.P. lived in the home, and Friedli sent a letter to Mother 2 weeks before trial indicating this was the case. Yet, KVC never changed the permanency plan to require S.P. to move out of the house and never changed the plan to reflect that termination was the goal. See K.S.A. 2014 Supp. 38-2263(f)

18

(Permanency plan may be amended upon agreement of plan participants; if the amendment changes the permanency goal, the court is to be notified and a permanency hearing scheduled.).

The district court found that Mother ignored "repeated admonitions by KVC that reintegration would not happen as long as [S.P.] was a part of the family." Without any substantiated evidence of abuse perpetrated by S.P. and without it being part of the permanency plan, Mother's parental rights are being terminated because S.P. continues to live with her. The district court found that KVC case managers repeatedly told Mother that they could not recommend reintegration while S.P. lived in the home. Yet, this requirement is not part of the permanency plan which KVC presented to Mother. It represents a change in the plan which was never presented to the court or even put in writing until 2 weeks before trial when Friedli sent a letter to Mother. The written permanency plan recognized not only the bond between Mother and children, the children's bond to one another, but the positive bond four younger children have with S.P.

It is not "reasonable efforts" for KVC to set up requirements for reintegration which are outside of the parameters of the written permanency plan without amendment of the plan. K.S.A. 2014 Supp. 38-2269(a)(7) requires the efforts of the agency be reasonable and those efforts must be shown by clear and convincing evidence.

We make one final observation regarding the efforts by KVC. With regard to S.P., Leader testified that one of his case plan tasks was to complete a psychological evaluation that included a sex offender evaluation. He did not complete this task. As with Mother, he completed all of his assigned tasks with the exception of the psychological evaluation. Mother testified S.P. was not objecting to the evaluation and the reason he had not obtained the evaluation was because he could not afford it. The record does not show any effort by KVC to assist S.P. in completing this task. The ultimate consequence of failure to comply with the single condition of the permanency plan was termination of

19

Mother's parental rights, yet the record shows no efforts by KVC with regard to that part of the plan.

We are not convinced a rational factfinder could find it was highly probable that KVC made reasonable efforts to rehabilitate the family.

*K.S.A. 2014 Supp. 38-2269(b)(8)—lack of effort on the part of a parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of a child.*

Mother also argues that the district court erred by finding that she was unfit because of a "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of [her children]" under K.S.A. 2014 Supp. 38-2269(b)(8). The district court found:

> "Throughout these proceedings, [Mother] has continued to insist that neither the State nor its agents in KVC or DCF had any right to tell her that she could not continue in a relationship with [S.P.] In fact, [Mother] was told repeatedly that reintegration could not be recommended as long as [S.P.] remained in the home. [Mother] was strongly encouraged to obtain individual counseling. She did not do so."

As discussed above, KVC determined at some point that reintegration would not occur as long as S.P. lived in Mother's home, but it failed to make that a part of the permanency plan. Having found it is unreasonable for KVC to impose a requirement outside of the permanency plan, we find that may not serve as the basis for finding Mother exhibited a lack of effort. Her effort was not perfect but it was substantial. Likewise, the only time the record suggests anyone discussed individual counseling with Mother was near the end of Leader's involvement in the case. We find there is not clear and convincing evidence to support the district court's conclusion that Mother exhibited a lack of effort sufficient to warrant termination of her rights. Mother was in compliance with the parts of the permanency plan which were within her control. She did not cause

20

the delay in compliance with the plan requirement for the psychological evaluation. Clear and convincing evidence refers to the quantity of evidence, and we are not convinced that standard has been met here.

*K.S.A. 2014 Supp. 38-2269(c)*

K.S.A. 2014 Supp. 38-2269(c) requires the court to consider a parent's failure to maintain regular communication and visitation when the child is not living at home. With respect to the visits between Mother and K.W. during the time she lived with the Fitzers, the court found: "There is no evidence from which to conclude that Mother attempted to maintain regular contact with her daughter." In this termination proceeding, the burden of proof is on the State and the evidence must be highly probable. For the district court to find clear and convincing evidence that Mother failed to maintain regular communication and visitation with a child not living at home, there must be affirmative evidence in the record supporting that point. No witness was asked about visits or communication between mother and K.W. and the Fitzers, and the evidence is uncontroverted that Mother exercised every opportunity to visit while the children have been in the custody of DCF.

We find there is no evidence from which the trial court can conclude it was highly probable that Mother did not attempt or exercise visits with her daughter while she was at the Fitzers.

*K.S.A. 38-2269(g)(1)—Best interests of the children*

Although we are convinced that a rational factfinder could not find clear and convincing evidence of unfitness, we address the issue of best interests of the children. For even if we affirmed the district court's determination that Mother was unfit and that

21

unfitness was unlikely to change in the foreseeable future, termination is appropriate only if it is in the best interests of the children.

In making the best interest determination, "the court shall give primary consideration to the physical, mental and emotional health of the child. If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2014 Supp. 38-2269(g)(1). In evaluating the best interests of the child, the district court must consider the nature and strength of the relationship between a parent and child and the trauma that termination may cause to the child. It must weigh these considerations against a further delay in permanency for the child. *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

If the court makes a finding of unfitness, the court then must determine whether termination of parental rights is in the best interests of the child. The district court's determination in this regard is a discretionary judgment call. On appeal, the appellate court reviews the best-interests determination for abuse of discretion. A district court abuses its discretion when no reasonable person would agree with its decision or the decision is based on a legal or factual error. If the district court makes any additional factual findings that relate solely to the best-interests determination, those findings may be made based on the preponderance of the evidence and are reviewed on appeal to see whether substantial evidence supports them. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2, 336 P.3d 903 (2014).

The district court's analysis focuses almost exclusively on Mother's shortcomings, yet the "primary" consideration is supposed to be the physical, mental, and emotional health of the children. The district court's analysis provides:

22

"These cases have been pending for almost a year as of the time of trial. [Mother] has made it clear that she chooses [S.P.] over her children despite being told repeatedly that he was an impediment to reintegration.

"These children deserve permanency. They are bonded to their mother, some more than others. These are sad cases, and these children have been let down by their parents and do not deserve to wait on them any longer."

The extent of the district court's analysis insofar as the children are concerned is their need for permanency and the length of time the case has been pending. We note first that nearly 7 months of the 10 month "delay" in providing permanency for the children is directly attributable to KVC and not Mother. It was KVC which assumed responsibility for arranging Mother's psychological examination and that was not accomplished until almost 7 months after the case was filed and 3 months after the petition to terminate was filed. While permanency is extremely important, so is Mother's right to parent. There must be thoughtful analysis about the effect of termination on the children, and it must include more than pointing to the children's need for permanency.

Case manager Leader testified that D.W. and L.W. had a "very good" relationship with Mother and "they seemed pretty close." Mother was able to show loving gestures and was fairly engaged with D.W. and L.W. She described Mother's relationship with K.W. as appropriate but superficial. The boys, J.W. and J.W., mostly interacted with each other during visits, but Mother was able to express her affection for the boys. The permanency plan notes that Mother is bonded to the children, the children to one another, and that at least the four younger children have a positive relationship with S.P.

In its findings, the district court noted that Mother was bonded to the children but there was no analysis by the district court of the nature and strength of the relationship between Mother and child. As of the time of trial, the five children, although bonded to one another, were placed in four different placements. There is no analysis by the district court what impact splitting the children apart would have on their individual mental and

23

emotional health. Although K.W. and J.W. were in counseling, no evidence was presented by any witness about the issues being addressed or the effects on the children of terminating Mother's rights. J.W., D.W., and L.W. had assessments and it was determined therapy was not appropriate. These children lived their entire lives in Mother's home with the exception of 2 months in 2009 and during this present case. There is a dearth of evidence suggesting Mother's presence in these children's lives is detrimental to them. No witness suggested the four younger children were not cared for appropriately and there is no evidence which indicates those children were themselves subjected to any emotional neglect by Mother.

The district court's findings fail to address the nature and strength of the relationship between Mother and the children and the trauma which may result to them from a termination of Mother's rights as set forth in *In re K.R.*, 43 Kan. App. 2d 891. We find the district court abused its discretion by failing to consider the effect of termination on the mental and emotional health of the children as required by K.S.A. 2014 Supp. 38-2269(g)(1).

We reverse the termination of Mother's parental rights. Mother did not challenge the CINC determination, therefore we remand this matter to the district court for a dispositional hearing pursuant to K.S.A. 2014 Supp. 38-2253.

Reversed and remanded with directions.